*In Re: W.W.,* No. 1287, Sept. Term 2020, No. 288, Sept. Term 2021 (consolidated). Opinion by Eyler, J.

**JUVENILE CAUSES – CINA**

When W.W. was born, the child tested positive for several drugs. At the time of conception, the mother was married but separated from her husband. Also at the time of conception, the mother was having a sexual relationship with two men, Mr. A. and Mr. W.

W.W. was found to be a CINA by the Juvenile Court. The husband submitted to genetic testing and was ruled out as the father. Both Mr. A. and Mr. W. claimed to be the father. The Juvenile Court determined that it was in W.W.'s best interest to order genetic testing of Messrs. A. and W. The mother and Mr. W. appealed from that decision.

The genetic test established that Mr. A. was the father, and the Juvenile Court ordered that Mr. W. be removed from the case. The mother and Mr. W. appealed from that decision.

On appeal, the cases were consolidated. In an unreported opinion, this Court affirmed the Juvenile Court's decisions.

The parties discussed Md. Code, Estates & Trusts (ET), § 1-208.1 and Md. Code, Family Law (FL), § 5-306 as possible controlling statutes. ET § 1-208.1 applies to the rebuttal of the presumption of parentage that derives from marriage and FL § 5-306 applies to guardianship and adoption proceedings. Thus, neither controlled.

Held that the Juvenile Court did not err in relying on Md. Code, Courts & Judicial Proceedings (CJP), § 3-803(b), which give a Juvenile Court jurisdiction over the custody, visitation, support, and paternity of a child whom the court finds to be a CINA. Thus, pursuant to CJP § 3-802(c)(2), the best interest of the child governs even though it does not govern under the ET Article. *See* § 1-208.1(c) ("An individual who is the putative father of a child in a proceeding under Title 5, Subtitle 10 of the Family Law Article may obtain and use evidence of blood or genetic testing in the proceeding to the extent authorized under Title 5, Subtitle 10 of the Family Law Article to rebut a presumption of parentage under § 1-208(c)(1) or (2) of this subtitle, regardless of whether it is in the best interest of the child.").

Circuit Court for Queen Anne's County
Petition No.: C-17-JV-20-000015

<u>REPORTED</u>

<u>IN THE COURT OF SPECIAL APPEALS</u>

<u>OF MARYLAND</u>

**CONSOLIDATED**

No. 1287
September Term, 2020

No. 288
September Term, 2021

_____

IN RE: W.W.

_____

Fader, C.J.,
Nazarian,
Eyler, James R.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, James R., J.
_____

Filed:  December 16, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

These consolidated appeals arise from decisions of the Circuit Court for Queen Anne's County, sitting as a juvenile court, addressing competing claims of paternity in a CINA[1] proceeding involving the child, W.W. Ms. S.[2] ("Mother") and Mr. W. are the appellants and the Queen Anne's County Department of Social Services (the "Department") and Mr. A. are the appellees.

Mother presents the following questions for our review which we have rephrased as follows:[3]

1. Did the circuit court err in determining that the best interests of W.W. required genetic testing of two possible fathers?

2. Did the circuit court err in determining that Mr. A. was the biological father of W.W.?

For the reasons set forth below, we shall affirm the judgments of the juvenile court.

## FACTUAL AND PROCEDURAL BACKGROUND

W.W. was born in a motel room outside Chestertown, in April 2020, and transported to Easton Memorial Hospital, where he tested positive for opiates, fentanyl, cocaine, morphine, and benzoylecgonine. Mother tested positive for cocaine, heroin, and

---

[1] A "child in need of assistance" ("CINA") is one who requires court intervention because the child has been abused or neglected, or has a developmental disability or mental disorder; and his or her "parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Md. Code (1973, 2020 Repl. Vol.), Courts & Judicial Proceedings Article ("CJP") § 3-801(f).

[2] Mother is referred to in the record as Ms. S. and Ms. C.

[3] Mr. W. did not file a brief, opting instead to adopt the Brief and Appendix filed on behalf of Mother. We shall refer to the arguments of Mother and Mr. W. collectively as those of Mother.

cannabinoid (marijuana). W.W. remained hospitalized for more than one month to receive treatment for significant drug-withdrawal symptoms.

At the time of W.W.'s conception and birth, Mother was married to Mr. S., who lived in Tennessee, and whom she had not seen in two years. At the time of W.W.'s conception, Mother had been in sexual relationships with two men: Mr. W. and Mr. A. At different times, Mother identified to the Department both Mr. A. and Mr. W. as W.W.'s father. In May of 2020, Mother, who was living in a hotel with Mr. W., sought to remove W.W. from the hospital and take him with her to Delaware to live with Mr. W., whom she referred to as "the dad". Because W.W. was being weaned from a morphine drip, he could not be discharged from the hospital. The court ordered that W.W. be sheltered by the Department upon discharge from the hospital. On May 29, 2020, the Department placed W.W. with the C. family.

The Department filed a CINA petition alleging that, because Mother was unable or unwilling to provide a safe, stable and drug-free home for W.W., and because the Department was unable to ascertain the identity of W.W.'s biological father, W.W. was a CINA. The Department requested that the court hold an adjudicatory and disposition hearing on the petition and order the alleged fathers to submit to paternity testing to determine the identity of W.W.'s biological father.

On August 27, 2020, following the adjudication hearing, the allegations in the CINA petition were sustained as to Mother only. The court found that: 1) Mother had given birth to W.W. in a motel room, where he was born drug-exposed to opiates and cocaine; 2) she had declined evaluation and treatment for substance abuse despite the Department's

2

referrals to multiple treatment centers (including both inpatient and outpatient settings), and had refused the recommended level of treatment; 3) she had charges pending and faced a possible prison sentence; 4) she presented no evidence that she had the ability to provide a safe, stable, and drug-free home for W.W.; and 5) she was unable to identify any maternal family members as relative resources for W.W.

The court determined that W.W. had undergone drug-withdrawal treatment for thirty-three days and noted there was no "greater circumstance" of being placed at risk of substantial harm than being born drug-exposed. The court concluded that: 1) W.W. had been abused and neglected, 2) Mother was unable and unwilling to provide W.W. with proper care and attention, and 3) Mr. S., the presumptive father, was unwilling to be a resource for W.W. or provide him proper care and attention. Accordingly, W.W. was adjudicated CINA.

The court proceeded to the disposition phase of the hearing and considered the issue of paternity. The court noted that the Department had been unable to definitively determine the identity of W.W.'s biological father and therefore was unable to ascertain any paternal resources for W.W. Mr. S. denied paternity because he had not had physical relations with Mother in three years. Mr. A. believed that he was W.W.'s biological father. He stated that he had known Mother for approximately sixteen years and that he and Mother had a sexual relationship between May and November of 2019. He stated that Mother had informed him during her pregnancy that he was W.W.'s father and he had attended several prenatal appointments with Mother prior to their separation. He explained that he ended the relationship when he learned that Mother was seeing other people, including Mr. W.

3

According to Mr. A., he and Mother had discussed possible names and Mother had created a collage that included the name that they had chosen together. On the day that W.W. was born, Mother called Mr. A. to tell him that she was in labor. Mother also texted Mr. A. a photo of W.W. and acknowledged that Mr. A. was the father. Mr. A. went to the hospital and attempted unsuccessfully to see W.W. Mother asked Mr. A. to relinquish his paternal rights to W.W., but Mr. A. declined.

Mr. W. testified that he had known Mother since 2019 and their sexual relationship began in June of 2019. During his sexual relationship with Mother, Mr. W. was aware that she was also in a relationship with Mr. A. Mr. W. stated that he had told everyone he knows that he is W.W.'s father.

Mr. S. submitted to genetic testing and the results showed a 0.0% probability that he was W.W.'s father. Mother did not challenge the paternity results. Mr. S. was excused from the case without objection. Based upon testimony presented by Mr. W. and Mr. A., the magistrate determined that it was in W.W.'s best interests that Mr. W. and Mr. A. both submit to genetic testing to determine whether either of them could be ruled out as W.W.'s father. The court adopted the magistrate's recommendation and findings, concluding that it was in W.W.'s best interests. Mother and Mr. W. each noted an appeal from that order.[4] Mother did not challenge the court's CINA finding.

Genetic testing revealed that Mr. A. is W.W.'s biological father. The magistrate recommended that Mr. A. be declared W.W.'s father and that Mr. W. be removed from the

---

[4] This appeal was docketed as No. 1287, Sept. Term, 2020.

case.  At the exceptions hearing on April 8, 2021, Mother argued that it was in W.W.'s best interests for their "family unit" to remain intact and to have Mr. W. named as W.W.'s father and Mr. A. excluded as a party.  The court denied Mother's exceptions and removed Mr. W. from the case.  Mother and Mr. W. each noted an appeal.[5]

## MOTION TO DISMISS APPEAL

The Department moved to dismiss Mother's appeal from the order of January 14, 2021, arguing that the order was not a final order as to Mother.  CJP §12-303(3)(i) provides for an interlocutory appeal from an order granting an injunction "if the appellant has first filed an answer in the cause."  The January 14, 2021 order is an injunctive order as to Mr. W.  Although it is unclear what constitutes an "answer" within the meaning of the statute, Mr. W. was an active participant in "the cause."  We conclude that Mr. W. had the right to appeal the interlocutory January 14, 2021 order.  Therefore, we need not address the appealability of that order as to Mother.

Alternatively, the January 14, 2021 order is reviewable as to Mr. W. for the following reason.  Because the subsequent order of April 8, 2021 disposed of all the claims involving Mr. W. and Mr. W. was removed from the case, the circuit court had discretion to expressly determine in a written order that there was no just reason for delay and direct the entry of a final judgment pursuant to Md. Rule 2-602(b).  We see no just reason to delay a determination of the issue presented, and therefore, enter judgment on our own initiative.  Md. Rule 8-602(g); *see Kamin-A-Kalaw v. Dulic*, 322 Md. 49, 54 (1991).  Ordinarily, the

---

[5] This appeal was docketed as No. 288, Sept. Term, 2021.

entry of that judgment would not permit review of the prior January 14, 2021 interlocutory order, as it would not be a conventional final judgment. *See Snowden v. Balt. Gas & Elec Co*. 300 Md. 555, 559-60 n.2 (1984); *Md. Bd. of Physicians v. Geier*, 225 Md. App. 114, 140-41 (2015). Here, however, because the previous interlocutory order "directly control[s] and [is] inextricably bound to the order that is treated as final for purposes of appeal," that prior ruling may be reviewed on appeal. *See Davis v. Attorney General*, 187 Md. App. 110, 122-23 (2009). Accordingly, we have jurisdiction to review the January 14, 2021 order as well as the April 8, 2021 order.

## DISCUSSION

In CINA cases, we review the factual findings of the juvenile court for clear error. *In re J.R.*, 246 Md. App. 707, 730-31, *cert. denied,* 471 Md. 272 (2020). Where, as here, the key issue involves the interpretation and application of Maryland statutory law, we review the court's decision *de novo*, without deference to the juvenile's court's legal conclusions. *In re Malichi W.,* 209 Md. App. 84, 89 (2012). "[I]f an error is found, we then assess whether the error was harmless or if further proceedings are required to correct the mistake in applying the relevant statute or regulation." *In re J.R.* at 731. The final conclusion of the juvenile court, when based on proper factual findings and correct legal principles, will not be disturbed unless that decision is a clear abuse of discretion. *In re Yve S.*, 373 Md. 551, 586 (2003).

Mother argues that the juvenile court erred in declaring that Mr. A. was W.W.'s father based on genetic testing results. She contends that the juvenile court erroneously applied Md. Code (1974, 2017 Repl. Vol.), Estates and Trusts Article ("ET"), § 1-208.1 in

6

determining that it was in W.W.'s best interest to order genetic testing of two possible fathers. Mother asserts that the juvenile court should have relied on Md. Code (1984, 2019 Repl. Vol.), Family Law Article ("FL"), § 5-306 to determine that Mr. W. was W.W.'s father, without the need for genetic testing.

The Department argues that the juvenile court applied the correct statutory scheme under Title 1 of the Estates and Trusts Article in ordering genetic testing to definitively establish paternity for W.W. Mr. A. contends that the juvenile court did not err in finding that it was in W.W.'s best interests to order genetic testing of the two putative fathers. The Department further contends that, based on the results of the genetic testing, the juvenile court properly exercised its discretion in declaring Mr. A. to be W.W.'s father and dismissing Mr. W. from the case.

**Paternity Determinations in CINA Cases**

In CINA cases, the juvenile court has a statutory obligation to identify the "natural or adoptive" parents of the subject child. CJP § 3-822(a)(1) ("At each CINA hearing, the court shall inquire into, and make findings of fact on the record as to, the identity and current address of each parent of each child before the court."). *See also In re B.C.*, 234 Md. App. 698, 718 (2017) (stating that "CINA courts have the power to determine paternity in order to identify the proper parties to the CINA proceeding."). The juvenile court is empowered with concurrent jurisdiction over the "paternity of a child whom the court finds to be a CINA[.]" CJP § 3-803(b)(1)(i). After a finding that a child is CINA, the court is authorized to determine the paternity of that child. CJP § 3-819(c)(2). *See In re Thomas H.*, 381 Md. 174, 184 (2004).

7

In this case, once the court adjudicated W.W. as CINA, the court had the right to decide the question of his paternity.

## Rebuttal of Presumption of Mr. S.'s Parentage

In determining the paternity of a child, the first issue to be considered is the presumption of legitimacy. "In Maryland, a child born to a married woman is presumed to be the offspring of the woman's husband." *Sider v. Sider*, 334 Md. 512, 526 (1994). That presumption was originally codified in FL § 5-1027(c) ("There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception"); *Miles v. Stovall*, 132 Md. App. 71, 81 (2000) (citing §5-1027 (Md. Code. 1999)) and ET § 1-206(a)(1) ("A child born or conceived during a marriage is presumed to be the legitimate child of both spouses."). *See In re B.C.*, 234 Md. App. 698, 710-11 (2017). This presumption may be rebutted by evidence presented by the parties, including DNA evidence. *See* ET § 1-208.1(d)(1).

Historically both FL § 5-1027(c) and ET § 1-206 have been applied in paternity proceedings. *See Miles*, 132 Md. App. at 80-81. In 2019, however, the legislature amended § 5-1027(c) to clarify that "[t]he provisions of Title 1, Subtitle 2 of the Estates and Trusts Article regarding presumptions of parentage apply in an action under this subtitle." *See* Acts 2019 c. 437, § 1, effective June 1, 2019, Acts 2019 c. 438, § 1, effective June 1, 2019. In 2019, the legislature also added § 1-208.1 to the Estates and Trusts Article. *See* Acts 2019, c. 437, § 1, effective June 1, 2019. Subsection (a) of § 1-208.1 specifically provides that "[a]n individual who is the presumed parent of a child under this subtitle shall be considered to be the child's parent for all purposes, including … Child in Need of

8

Assistance proceedings, unless the presumption of parentage is rebutted in accordance with this section." ET § 1-208.1(a). Pursuant to ET § 1-208.1(b) "a presumption of parentage … may be rebutted only if a court … determines in a written order that it is in the best interest of the child to receive and consider evidence that could rebut the presumption." Subsection (d)(1) further provides that a presumption of parentage may be rebutted by "evidence of blood or genetic testing."

The juvenile court determined that, pursuant to ET § 1-206(a)(1), Mr. S. was the presumed father of W.W. In accordance with ET § 1-208.1(d)(1), the court ordered genetic testing to rebut that presumption. Based on the testing results excluding Mr. S. as the biological father of W.W., the presumption of his parentage was rebutted and he was dismissed from the CINA case, leaving Mr. A. and Mr. W. as potential fathers to W.W.

By its terms, ET § 1-208.1(d)(1) was limited to situations in which blood or genetic testing was used to rebut "the presumption of parentage." Once Mr. S. was excused as a party, there was no longer a "presumption of parentage" in the case.

### Genetic Testing of Mr. A. and Mr. W.

Mother contends that the juvenile court should have relied on FL § 5-306 to determine that Mr. W. was W.W.'s father without the need for genetic testing. Title 5, Subtitle 3 of the Family Law Article sets forth certain procedures applicable in guardianship and adoption proceedings. FL § 5-306 provides:

(a) Unless a court excludes a man as the father of a child, a man is the father if:

(1) the man was married to the child's mother at the time of the child's conception;

9

(2) the man was married to the child's mother at the time of the child's birth;

(3) the man is named as the father on the child's birth certificate and has not signed a denial of paternity;

(4) the child's mother has named the man as the child's father and the man has not signed a denial of paternity;

(5) the man has been adjudicated to be the child's father;

(6) the man has acknowledged himself, orally or in writing, to be the child's father and the mother agrees; or

(7) on the basis of genetic testing, the man is indicated to be the child's biological father.

Mother contends that Mr. W. meets certain criteria set forth in § 5-306, specifically, § 5-306(a)(3), because she had named him as the father and he has not signed a denial of paternity, and, under subsection (a)(6), he acknowledged himself to be W.W.'s father and she has agreed. She argues that the juvenile court should have recognized Mr. W. as W.W.'s father pursuant to FL § 5-306 and should not have ordered genetic testing.[6]

As the magistrate noted, FL § 5-306 "wouldn't help us in this situation because factors go both ways. They apply to both … Mr. [W.] and Mr. [A.]." Both Mr. A. and Mr. W. had provided evidence relevant to § 5-306(a)(3), as each had testified that Mother had, at varying times, identified each of them as W.W.'s father, and neither of them has denied paternity. There was also testimony relevant to § 5-306(a)(6), indicating that at varying

---

[6] Mother does not address the additional factor set forth in FL § 5-306(a)(7), which provides that "a man is the father if … on the basis of genetic testing, the man is indicated to be the child's biological father."

10

times, both men had acknowledged themselves to be W.W.'s father and Mother had agreed with them. In this case, the application of FL § 5-306 does not conclusively determine the question of parentage where, as here, the court is presented with two competing claims of paternity and both potential fathers satisfy the same elements of the statute. Moreover, FL § 5-306 is a paternity statute that applies in guardianship and adoption cases. *See* FL § 5-302(a) (specifying that Subtitle 3 applies only to: (1) guardianship of an individual committed to a local department as a CINA; 2) an individual committed to a local department as a CINA, without prior termination of parental rights as to the individual; and 3) adoption of an individual under a guardianship governed by Subtitle 3). Accordingly, we conclude, as did the juvenile court, that FL § 5-306 is not the proper statute to be applied in this CINA case to resolve the competing paternity claims of Mr. A. and Mr. W.

In adopting the magistrate's recommendations and findings of fact, the juvenile court determined that, pursuant to ET § 1-208 *and CJP § 3-803(b)*, it was in W.W.'s best interest that both Mr. A. and Mr. W. submit to genetic testing to determine if either of them could be ruled out as W.W.'s father. We hold that the court acted within the scope of its authority under CJP § 3-803(b) when it determined that it was in W.W.'s best interest to order that Mr. A. and Mr. W. submit to genetic testing in order to identify W.W.'s biological father.

In all CINA proceedings, the juvenile court's foremost obligation is to "protect and advance a child's best interests." CJP § 3-802(c)(2). *See In re Priscilla B*., 214 Md. App. 600, 622 (2013) ("The purpose of CINA proceedings is 'to protect children and promote their best interests.'") (citation omitted); *In re Najasha B.,* 409 Md. 20, 33 (2009)

11

(observing that "[t]he broad policy of the CINA Subtitle is to ensure that juvenile courts (and local departments of social services) exercise authority to protect and advance a child's best interests when court intervention is required"). "The juvenile court, 'acting under the State's *parens patriae* authority, is in the unique position to marshal the applicable facts, assess the situation, and determine the correct means of fulfilling a child's best interests.'" *Id.* at 34 (quoting *In re Mark M*., 365 Md. 687, 707 (2001)).

The juvenile court's role in a CINA case, where there has been evidence of abuse or neglect, "'is necessarily more pro-active.'" *In re Billy W*., 386 Md. 675, 685 (2005) (quoting *In re Mark M*., 365 Md. at 706). "One of the important purposes of the child welfare system is to provide a permanent and stable environment for children declared CINA, and to prevent those children from languishing in foster care." *Id. See also In re Adoption of Cadence B*., 417 Md. 146, 164 (2010) (explaining that "courts and legislatures attempt to limit the amount of time a child is in foster care, citing its detrimental effect on a child's well-being[.]"). The Court of Appeals has recognized that "[a] critical factor in determining what is in the best interest of a child is the desire for permanency in the child's life." *In re Adoption of Jayden G*., 433 Md. 50, 82 (2013).

Mother contends that the court's order of genetic testing infringed on her constitutional right to the care and custody of W.W. and disregarded the presumption that she acted in the best interest of W.W. in asserting that Mr. W. is his father. She argues that the court abused its discretion in failing to recognize that W.W.'s permanency plan remained reunification and that she had planned to reunify with W.W. and include him in her "family unit" with Mr. W.

12

"This Court has recognized the 'fundamental right of parents generally to direct and control the upbringing of their children.'" *In re Adoption/Guardianship of L.B.*, 229 Md. App. 566, 588-89 (2016) (quoting *Brandenburg v. LaBarre*, 193 Md. App. 178, 186 (2010)) (in turn, quoting *Koshko v. Haining*, 398 Md. 404, 422 (2007)). That fundamental right, however, "'must be balanced against the fundamental right and responsibility of the State to protect children, who cannot protect themselves, from abuse and neglect.'" *Id*. at 589 (quoting *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 497 (2007)). In resolving the conflict between a parent's fundamental rights in the child and the State's interest in protecting the child, "the best interest of the child standard applies and 'trumps all other considerations[.]'" *In re K.L.*, 252 Md. App. 148, 176-77 (2021) (explaining that "[t]he parent does not lose his or her fundamental rights but, when a child is adjudicated to be a CINA, the court may determine a disposition that protects the child").

The juvenile court considered the meritorious arguments of Mr. W. and Mr. A., each having reason to believe that he was the father of W.W. The court also weighed Mother's position that the acknowledgement of Mr. W. as W.W.'s father would further her family reunification goals. On balance, the court considered W.W.'s need for stability, and the permanency that would result from an accurate determination of his paternity. The court did not abuse its discretion in deciding that it was in W.W.'s best interest to determine his

13

father using genetic testing, and in declaring Mr. A. to be W.W.'s father based on those results.

**JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**